UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

GAGOSIAN GALLERY, INC.,                           Case No. _____

        *Plaintiff,*                                                       **COMPLAINT**

      v.                                                                    **JURY TRIAL DEMANDED**

PELHAM EUROPE, LTD.,

        *Defendant.*

-------------------------------------------------------------------x

      Plaintiff Gagosian Gallery, Inc. ("Plaintiff" or the "Gallery"), by and through its undersigned attorneys, hereby brings this action for a declaratory judgment and injunctive relief against Defendant Pelham Europe, Ltd. ("Pelham" or "Defendant"), as well as for an order quieting title to property located in this District.

**PRELIMINARY STATEMENT**

      1.     This is an action to quiet title to a sculpture by Pablo Picasso, *Buste de Femme (Marie Thérèse)* (Bust of a Woman (Marie Thérèse)), Boisgeloup, 1931 (the "Work"). The Work currently is in New York on loan to the Museum of Modern Art ("MoMA") for a public exhibition, courtesy of Plaintiff, where it is scheduled to remain until February 7, 2016. An actual controversy regarding the Work exists between Plaintiff, who is the current owner of the Work and has entered into an agreement to sell the Work to a third-party buyer, and Defendant, who is attempting to enforce a purported prior agreement to buy the Work. Defendant has threatened to seize the Work here in New York and has initiated legal actions in multiple jurisdictions, including in this District, as part of its efforts to seize the Work. Here, Plaintiff seeks a declaratory judgment that it took title to the Work no later than October 2015 free and clear of any claim by Defendant, and an order quieting Plaintiff's title, so that it can continue to

enjoy the benefits of its ownership, including the right to proceed to transfer the Work to its third-party buyer.

2.  In 2011, Plaintiff exhibited the Work in New York on behalf of its former owner, Maya Widmaier-Picasso ("Maya").  As a result of the exhibition, several bidders offered to pay more than $100 million for the Work.  Although these offers did not result in a sale at the time, they convinced Plaintiff, which is an art gallery and dealer, that it could easily find a buyer in that price range if Maya ever would agree to sell the Work.

3.  Further to the offers received in 2011, in May 2015, Maya, with the advice of her daughter Diana Widmaier-Picasso ("Diana"), agreed to sell the Work to Plaintiff for $105.8 million, in contemplation that Plaintiff would re-sell the Work.  In this transaction, Plaintiff purchased the Work from Maya.  In fact, the terms of Plaintiff's agreement with Maya, memorialized in a May 12, 2015 invoice (the "Gallery Invoice"), have already given Plaintiff good title to the Work.  *See* Exhibit ("Ex.") A hereto.  Specifically, title passed "following payment of the third installment" of the purchase price, which Plaintiff made on October 2, 2015.  *See id.*  To date, Plaintiff has paid $79.735 million to Maya, or 75% of the purchase price for the Work.

4.  Plaintiff thus took title to the Work under the Gallery Invoice.

5.  Plaintiff did not learn anything about Defendant's claim to the Work until late October 2015, when Defendant learned the Work was at MoMA courtesy of Plaintiff, and wrote a letter to Plaintiff in New York asserting that Defendant had a purported "Priority Claim" to the Work.  *See* Ex. B hereto.  Subsequently, Defendant threatened, in conversations with Plaintiff's counsel, to have the Work removed from MoMA.

6.  Defendant now claims to have secured an agreement to buy the Work at an inexplicably low price.  Specifically, Defendant asserts that, acting through an intermediary

2

called Connery Pissarro Seydoux ("CPS"), it secured an agreement in November 2014 to pay *just €38 million* (roughly $42 million) for the Work (the "Pelham Agreement"). Buying at this price would have given Defendant an instant *$60-million-plus windfall* at Maya's expense. And Maya herself would have received just €33.5 million after CPS's commission, an even worse deal for her, and even less comprehensible in light of the prior offers above $100 million.

7.  Even setting aside how Defendant managed to secure Maya's supposed consent to such an unreasonably low price, and whether the Pelham Agreement—which Maya contests—was ever validly entered into, the Pelham Agreement gives Defendant no claim to obtain the Work. Under its plain English terms, Defendant never took title to the Work. The Pelham Agreement provides that "no title shall pass to the buyer, and buyer shall have no right whatsoever on the Property, until it has *made full payment* in good, clear funds." *See* Ex. C hereto (emphasis added). Defendant admittedly never fulfilled this condition: after consulting with Diana—who reminded her of the prior $100-million-plus offers for the Work—Maya contested the sale to Defendant as null and void, well before Defendant made full payment for the Work. In fact, Defendant paid only €6 million of the €38 million purchase price before Maya contested the sale. Maya also returned all payments she had received to CPS and, upon information and belief, Defendant in turn received its money back from CPS.

8.  Despite the inherent flaws in its purported claim to the Work, Defendant has made multiple threats and other efforts to enforce the sale and secure delivery of the Work, both in New York and in Europe. In addition to threatening to seize the Work in New York, Defendant sued Maya in Switzerland (the "Swiss Action") in an effort to get execution of the sale and delivery of the Work under the Pelham Agreement. Defendant then petitioned a French court to seize the Work from Maya (the "French Action"), but was unsuccessful.

3

9. To cap it off, Defendant commenced proceedings in this District in an attempt to obtain discovery from Plaintiff relating to the Work. Specifically, on November 18, 2015, Defendant filed a petition in this Court pursuant to 28 U.S.C. § 1782 (the "Discovery Petition") seeking the production of documents and a deposition from Plaintiff and from Diana purportedly in aid of the Swiss and French Actions.

10. Tellingly, in the Discovery Petition, Defendant *admits* that if any U.S. purchaser took "good title" to the Work, this would "moot the [Swiss Action] and prevent Pelham from enforcing its rights under the [Pelham] Agreement." *See* Discovery Petition, No. 15 Civ. 370 (GW), ECF No. 8 at 11 (S.D.N.Y. Nov. 19, 2015). That is exactly what occurred here: Plaintiff has taken good title to the Work under the Gallery Invoice.

11. Defendant's purported claim to the Work, and the various actions it has taken in pursuit of that claim, cloud Plaintiff's title to the Work. These efforts are also jeopardizing Plaintiff's ability to sell the Work in the ordinary course. In fact, Plaintiff already has secured a buyer for the Work in New York and, once the MoMA exhibition concludes in February, Plaintiff will imminently become obligated to transfer title of the Work to that buyer. Plaintiff therefore urgently needs a declaration that Plaintiff took good title to the Work, free and clear of any claim by Defendant.

## JURISDICTION

12. Subject matter jurisdiction lies in this Court pursuant to 28 U.S.C. § 1332 because Plaintiff is domiciled in New York and Defendant is domiciled in the United Kingdom.

13. Personal jurisdiction lies in this Court for multiple reasons. First, the Work itself currently is in this District on display at MoMA. Second, Plaintiff resides in this District and conducts its business here, and has already entered into an agreement to sell the Work to a buyer in New York. Third, Defendant actively and purposefully targeted Plaintiff in this District,

seeking to interfere with Plaintiff's title to the Work, Plaintiff's provision of it to MoMA, and Plaintiff's attempts to consummate its sale of the Work in this District.  Among other things, Defendant hired counsel in this District for the purpose of sending Plaintiff a demand letter asserting a purported "Priority Claim" to the Work.  Defendant's counsel went so far as to threaten to seek a temporary restraining order ("TRO") to attempt to obtain the Work.

14. Fourth, Defendant commenced proceedings in this District in connection with its claim to the Work.  As stated, Defendant has filed the Discovery Petition in this District pursuant to 28 U.S.C. § 1782 to take discovery of Plaintiff in aid of the Swiss and French Actions.  *See In re Application of Pelham Europe, Ltd. For Judicial Assistance Pursuant to 28 U.S.C. § 1782*, No. 15 Misc. 0370 (GW) (S.D.N.Y. Nov. 18, 2015).

15. This Court also has jurisdiction to issue a judgment removing a cloud upon the title to the Work pursuant to 28 U.S.C. §§ 1655 and 2201(a) because the Work is located in this District and an actual controversy exists between the parties as to its ownership.

## VENUE

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff purchased the Work while Plaintiff was located in this District and also arranged for delivery of the Work to be held at MoMA in this District.  The Work itself currently remains located in this District.

17. Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to this Court's personal jurisdiction (*see supra* ¶ 13).

## PARTIES

18. Plaintiff is a corporation organized under the laws of New York. Plaintiff's principal place of business is 980 Madison Avenue, New York, New York, 10075.

19. Defendant is an entity organized under the laws of the United Kingdom. Defendant's principal place of business is 5 Hanover Square, London NW1S HE, United Kingdom.

## FACTUAL ALLEGATIONS

### A. PLAINTIFF EXHIBITS THE WORK AND MAYA RECEIVES MULTIPLE OFFERS FOR MORE THAN $100 MILLION

20. Maya, who lives in France, owns numerous works of art by her father, Pablo Picasso.

21. Plaintiff previously has exhibited and sold works by Picasso, both for Maya and Diana and also for other private collectors. Over the years, Plaintiff has dealt directly with Diana to arrange for both the exhibition and sale of Picasso's works owned by Maya.

22. In 2011, Diana worked with Plaintiff to organize an exhibition of various Picasso works inspired by the relationship between Maya's parents, Pablo Picasso and Marie Thérèse Walter. The exhibition, titled *Picasso and Marie-Thérèse: L'Amour Fou* (the "2011 Exhibition"), featured the Work and ran at the Gallery's Chelsea facility in New York, New York from April 14–June 15, 2011.

23. During the 2011 Exhibition, the Gallery received several offers to purchase the Work for more than $100 million. Although Maya did not sell the Work at the time, the offers nevertheless demonstrated that if she ever wanted to sell the Work, she could look to the Gallery for a sale in that price range. Going to the Gallery would also be appropriate in light of Plaintiff's assistance in showing the Work at the 2011 Exhibition, which led to the offers.

6

**B. PLAINTIFF PURCHASES THE WORK FROM MAYA WITH DIANA'S CONSENT AND ASSISTANCE AND IDENTIFIES A BUYER FOR THE WORK, AND THE WORK IS THEN EXHIBITED AT MoMA**

24. Further to the offers made to Maya in 2011, in April 2015, Diana contacted the Gallery to inquire about selling the Work. In contemplation of being able to re-sell the Work, the Gallery made an offer to buy the Work for $105.8 million.

25. In or about late April 2015, Maya, with the consent and advice of Diana, accepted the offer.

26. Maya then issued to Plaintiff the Gallery Invoice, dated May 12, 2015, setting forth the terms of the parties' agreement. The Gallery Invoice stated the price of the Work, $105.8 million, and established a payment schedule. It also specified that title to the Work would pass to Plaintiff following the third scheduled payment for the Work.

27. Plaintiff timely made the third payment on October 2, 2015. Plaintiff has made all required payments and has now paid $79.735 million, or 75% of the total price for the Work.

28. Plaintiff took title to the Work on October 2, 2015 under the plain terms of the Gallery Invoice.

29. Plaintiff negotiated its agreement with Maya from New York, New York. Plaintiff also coordinated with Maya to arrange for shipment of the Work to MoMA in New York, New York, so that the Work could be exhibited courtesy of Plaintiff.

30. The Work is currently at the MoMA exhibition, which runs through February 7, 2016.

31. In addition, Plaintiff has entered into an agreement to sell the Work to a third-party purchaser located in New York. Under this agreement, following the MoMA exhibition, Plaintiff will soon become obligated to transfer title of the Work to the purchaser.

C. **UNBEKNOWNST TO PLAINTIFF, DEFENDANT OBTAINS A DEAL TO PURCHASE THE WORK FOR €38 MILLION, BUT WITHOUT TRANSFERRING TITLE**

32. When Plaintiff purchased the Work, Plaintiff had no knowledge that Defendant had any prior dealings with Maya concerning the Work.

33. In the Discovery Petition, Defendant claims that in October 2014, Maya granted authority to CPS for a two-month period to sell the Work on her behalf (the "CPS Agreement"). Defendant further claims that, on November 13, 2014, acting under the CPS Agreement, CPS sold the Work to Defendant for just €38 million (roughly $42 million).

34. The Pelham Agreement set forth the following payment schedule:

- December 1, 2014:    €1,900,000
- January 15, 2015:    €4,100,000
- April 20, 2015:    €32,000,000

*See* Ex. C.  Maya would only receive €33.5 million of this amount after CPS's commission.

35. The Pelham Agreement, which is written in English, also stated that "***no title shall pass*** to the buyer, and buyer shall have ***no right whatsoever on the Property,*** until it has made ***full payment*** in good, clear funds."  *See id.*

36. At the time of the Gallery Invoice, no one at the Gallery was aware of any of the discussions or dealings among CPS, Defendant, and Maya, nor of the CPS Agreement or the Pelham Agreement.

D. **MAYA CONTESTS THE SALE TO DEFENDANT, AND PELHAM NEVER PAYS IN FULL FOR THE WORK—PREVENTING IT FROM TAKING TITLE**

37. On information and belief, in March 2015, Diana learned about the sale to Pelham.  Diana reminded Maya of the previous offers received by Plaintiff following the Exhibition to purchase the Work for more than $100 million.

38. On April 10, 2015, Maya notified CPS that she was contesting the sale to Pelham as null and void.

8

39. Up until that point, Defendant had paid only €6 million (€1.9 million in December 2014 and €4.1 million in January 2015, per the schedule in the Pelham Agreement) to CPS. Also on April 10, 2015, Maya returned all payments she had received to CPS.

40. CPS accepted all the money returned by Maya.

41. By a letter dated May 11, 2015, CPS unilaterally canceled the CPS Agreement.

42. Upon information and belief, CPS then returned to Defendant the full €6 million it had paid, and Defendant accepted these returned funds.

43. Independently of the legal validity of the CPS Agreement and thus of the Pelham Agreement, Defendant never "made full payment" by completing the payments set forth in the Pelham Agreement.

44. Defendant thus never took title to the Work under the plain English terms of the Pelham Agreement—regardless of the propriety of the Pelham Agreement or Defendant's dealings with Maya via CPS, and regardless of whether the Pelham Agreement could somehow remain in effect despite Maya's declaration that the Pelham sale was null and void.

E. **DEFENDANT CLOUDS TITLE TO THE WORK BY BRINGING LITIGATION IN EUROPE TO TRY TO SEIZE THE WORK, INFORMING PLAINTIFF FOR THE FIRST TIME IN LATE OCTOBER 2015 OF ITS PURPORTED CLAIM TO THE WORK, AND SEEKING DISCOVERY FROM PLAINTIFF IN THIS DISTRICT IN CONNECTION WITH ITS PURPORTED CLAIM**

45. Doubling down on its attempt to seize a $100-million-plus Work for €38 million, Defendant has filed suit in Switzerland against Maya and CPS. On May 13, 2015, Pelham filed the Swiss Action in the Geneva Court of First Instance, styled *Pelham Europe Ltd. v. Maya Widmaier-Ruiz-Picasso et Connery Pissaro Seydoux SA*, C/9920/2015-5-C.

46. In the Swiss Action, Pelham asserts that the Pelham Agreement is enforceable. Pelham seeks an order directing Maya to deliver the Work to Pelham. Further underscoring that Pelham has not made "payment in full" under the Pelham Agreement, Pelham has also asked the Swiss court to order Maya to accept the full payment.

9

47. On October 19, 2015, Defendant wrote to Plaintiff to assert that it had a "Priority Claim" to the Work. In the letter, Defendant informed Plaintiff of the Swiss Action in which Defendant sought to obtain possession of the Work. Mr. Gagosian, who had been traveling at the time, did not see the letter until October 27, 2015, when he returned to the Gallery in New York. *See* Ex. B.

48. Defendant's purported claim was news to Plaintiff. Prior to this time, neither Mr. Gagosian nor anyone else acting on Plaintiff's behalf had any knowledge that another party had any claim to or interest in the Work—much less been informed of such interest.

49. Defendant has brought the Discovery Petition now as well. The Discovery Petition expressly seeks discovery of Plaintiff's involvement in any transactions related to the Work "in aid of" Defendant's claim to take possession of the Work in Switzerland, even though it has not yet properly pursued discovery in the Swiss Action. *See* Discovery Petition, No. 15 Civ. 370 (GW), ECF No. 8 at 11 (S.D.N.Y. Nov. 19, 2015).

50. In the Discovery Petition, Defendant also asserts that it is attempting to recover the Work through an order of seizure from a French court in the French Action. It has not succeeded in that effort, and lost its claim in a summary proceeding (Ordinance, President of the Paris Tribunal de Grande Instance, Nov, 26, 2015). However, Defendant states in the Discovery Petition that it intends to continue pursuing the French Action.

51. In the Discovery Petition, Pelham admits that if any U.S. purchaser took "good title" to the Work, this would "moot the [Swiss Action] and prevent Pelham from enforcing its rights under the [Pelham] Agreement." *See id.* at 11.

52. In conversations with Plaintiff's counsel, Defendant has also threatened to obtain a TRO to seize the Work and to have the Work immediately removed from MoMA and sent to

10

Europe—without regard to Plaintiff's rights or the benefit to the public of being able to view the Work.

### F. PLAINTIFF NEEDS A DECLARATORY JUDGMENT TO QUIET TITLE TO THE WORK

53. Defendant's express claim to the Work, and its willingness to use the Courts in Europe and the U.S. to take possession of it, creates an actual controversy with Plaintiff over the ownership of the Work.

54. Defendant's repeated threats and claims to the Work slander Plaintiff's rightful title, hinder Plaintiff's enjoyment of the Work, and interfere with Plaintiff's ability to sell the Work. In fact, Plaintiff already has entered into an agreement with a buyer in this District to sell the Work, and needs immediate relief from this Court to quiet title and end Defendant's interference.

55. Plaintiff thus urgently needs a declaratory judgment dispelling any doubt that Plaintiff currently owns the Work.

### G. THIS COURT IS THE BEST FORUM FOR DETERMINING PLAINTIFF'S OWNERSHIP OF THE WORK

56. The parties' dispute about ownership of the Work is best resolved in this District, by this Court.

57. Plaintiff's causes of action have a substantial nexus to New York, New York. The Work itself is currently located in this District. Plaintiff negotiated its purchase of the Work from this District and arranged for delivery here to MoMA. Consequently, the critical question of whether Plaintiff obtained a valid, enforceable title to the Work should be governed by New York law.

58. Plaintiff has also entered into an agreement to sell the Work to a third-party purchaser located in New York.

59. Moreover, Defendant has pursued the Work in this District. Defendant sent a demand letter to Plaintiff in this District. Defendant threatened to have the work removed from MoMA in this District. Defendant then deliberately used a court in this District to press its claim.

60. Consequently, Defendant is subject to discovery here. Moreover, the bulk of the necessary document discovery can be obtained in this District.

61. Alternatively, even if French law could be found to apply to the Gallery Invoice, Plaintiffs' claim is still best resolved in this Court. Courts in this District routinely accept diversity claims with the requisite nexus to New York even if they require the application of foreign law.[1] And the terms of the Gallery Invoice are equally effective under French law. Thus, even if French law could apply, Plaintiff still took title to the Work on October 2, 2015.

## CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT–VALID SALE UNDER THE GALLERY INVOICE

62. Plaintiff repeats and re-alleges paragraphs 1 through 61 as if fully set forth herein.

63. An actual and justiciable controversy exists between Plaintiff and Defendant. Plaintiff asserts that Plaintiff took good title to the Work. Defendant asserts that it may recover the Work in the Swiss Action. Moreover, Defendant admits that a showing that "good title" passed to Plaintiff would "moot" the Swiss Action and prevent Defendant from obtaining delivery of the Work under the Pelham Agreement. A declaration that Plaintiff took title to the Work, and thus that Defendant cannot recover it—regardless of whether the Pelham Agreement was ever enforceable or whether it was later canceled—is appropriate fully and finally to resolve

---

[1] *See, e.g., ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 428 (S.D.N.Y. 1998) (proper to retain action despite the need to apply El Salvadoran law).

the question of the ownership of the Work.  This case is therefore ripe for declaratory relief pursuant to 28 U.S.C. § 2201(a).

64. Under the Gallery Invoice, Plaintiff took title to the Work on October 2, 2015.

65. Defendant, in contrast, has no claim to holding title to the Work.  No matter what law applies to the Pelham Agreement, it clearly and unequivocally provides (in English) that transfer of title does not occur until Defendant "has made full payment" for the Work.  It is beyond dispute that Defendant has *not* made full payment for the Work.  To the contrary, Defendant paid only €6 million, a tiny portion of the €38 million purchase price, and even that amount was returned.  Consequently, even if the Pelham Agreement were valid, and not canceled by Maya, Defendant never took title under its plain terms.

66. Accordingly, Plaintiff is entitled to a declaration that Plaintiff took good title to the Work, free and clear of any claim by Defendant to the Work or against Plaintiff, pursuant to a straightforward interpretation of the relevant transaction documents.

### COUNT II: ORDER QUIETING TITLE PURSUANT TO 28 U.S.C. § 1655

67. Plaintiff repeats and re-alleges paragraphs 1 through 66 as if fully set forth herein.

68. The Work is located in this District.  This Court has authority to remove any cloud upon its title pursuant to 28 U.S.C. § 1655.

69. Plaintiff is entitled to an order removing the cloud upon Plaintiff's valid title to the Work that exists because of Defendant's purported claim under the Pelham Agreement, and quieting Plaintiff's title to the Work.

**COUNT III: ALTERNATIVE REQUEST FOR DECLARATORY JUDGMENT AS GOOD FAITH PURCHASER FOR VALUE (NEW YORK UCC § 2-403)**

70. Plaintiff repeats and re-alleges paragraphs 1 through 69 as if fully set forth herein.

71. Pelham contends, incorrectly, that Maya's contested discussions with CPS, and the Pelham Agreement, can somehow taint Maya's title notwithstanding Pelham's failure ever to obtain title under the Pelham Agreement by making "full payment."

72. Regardless, even if there were any merit to Pelham's allegations (and there is not), and Maya could somehow have been left with voidable title (which she was not), Plaintiff still took title superior to Pelham for the alternative reason that it qualifies as a good-faith purchaser for value pursuant to N.Y. UCC § 2-403.

73. Plaintiff had no knowledge whatsoever of Defendant's claim to the Work when Plaintiff agreed to purchase it from Maya. Plaintiff has paid value to Maya for the Work: $79.735 million, or 75% of the purchase price.

74. Plaintiff is thus entitled to a declaration that, even if Maya's title to the Work were somehow voidable on account of the canceled Pelham Agreement, (a) Plaintiff qualifies as a good faith purchaser for value pursuant to New York UCC § 2-403, and (b) Plaintiff therefore took good title to the Work, superior to any claim by Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

(A) That the Court enter a declaratory judgment against Defendant stating each of the following:

   (i) Plaintiff took good title to the Work, free and clear of any claim by Defendant to the Work or against Plaintiff; and

   (ii) Even if (as Pelham contends) Maya could be found only to have voidable title to the Work at the time of the sale to Plaintiff, Plaintiff still took good title because

14

Plaintiff qualifies as a good faith purchaser for value pursuant to New York UCC § 2-403;

(B) That the Court enter an order and judgment *in rem* pursuant to 28 U.S.C. §§ 1655 and 2201 that Plaintiff is the rightful owner of the Work;

(C) A judgment awarding costs to Plaintiff pursuant to Fed. R. Civ. P. 54(d) and an award of reasonable attorneys' fees;

(D) A trial by jury; and

(E) Such other relief as may be just and proper.

Plaintiff has also represented to the Court overseeing the Discovery Petition that the Work will remain in New York until at least the end of March 2015.

Dated:  New York, New York
            January 12, 2016

**DONTZIN NAGY & FLEISSIG LLP**

/s/Matthew S. Dontzin
Matthew S. Dontzin (MD-9377)
Tibor L. Nagy, Jr. (TN-1978)
David A. Fleissig (DF-5757)
Jason A. Kolbe (JK-3857)
980 Madison Avenue
New York, New York 10075
(212) 717-2900

*Attorneys for Plaintiff Gagosian Gallery Inc.*

mdontzin@dnfllp.com
tibor@dnfllp.com
dafleissig@dnfllp.com
jkolbe@dnfllp.com