# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

GAGOSIAN GALLERY INC.,

      Plaintiff and Counterclaim Defendant,

        v.

PELHAM EUROPE LTD.,

      Defendant and Counterclaimant.

---

PELHAM EUROPE LTD.,

      Third Party Plaintiff,

        v.

LARRY GAGOSIAN, DIANA WIDMAIER-PICASSO, and LEON BLACK,

      Third Party Defendants.

Civil Action No.
1:16-CIV-214-WHP

## DEFENDANT PELHAM EUROPE LTD.'S
## AMENDED THIRD PARTY COMPLAINT AGAINST
## LARRY GAGOSIAN, DIANA WIDMAIER-PICASSO, AND LEON BLACK

Erik Haas (ehaas@pbwt.com)
Julia Stepanova (jstepanova@pbwt.com)
Patrick Gibson (pgibson@pbwt.com)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for Pelham Europe, Ltd.*

Defendant Pelham Europe Ltd. ("Pelham"), by its undersigned attorneys, asserts these claims and alleges and states as follows:

## NATURE OF THE ACTION

1.     It is an infrequent occurrence that siblings' competing curry for their mother's favor and fortune leads to a flagrant breach of contract, and resulting proceedings in three countries implicating the interests of parties residing in three continents.  But that is exactly what happened here, where the two siblings are progeny of Pablo Picasso, and one is aligned with and financed by the art dealer and magnate Larry Gagosian.

2.     Olivier Widmaier-Picasso ("Olivier") (the grandson of Pablo Picasso) and Maya Widmaier-Picasso ("Maya") (Olivier's mother and Pablo's daughter) negotiated and effectuated an arms-length sale to Pelham of the original plaster sculpture by Pablo Picasso, titled *Buste de Femme (Marie Thérèse)*, or *Bust of a Woman (Marie Therese)*, Boisgeloup, 1931 (the "Sculpture").  Throughout the negotiations, Olivier and Maya were represented by the renowned art dealers Connery Pissarro Seydoux, S.A. ("CPS").  Olivier, who is a lawyer and runs his own art advisory firm, provided "consulting" services to CPS, and was compensated by CPS for doing so.  CPS negotiated on behalf of Maya a sale price of almost $50 million for the Sculpture, which as of the closing in November 2014, set a new record-high price for comparable sculptures and was $20 million in excess of the prior record for a sculpture by Pablo Picasso.  That price was at a significant premium to the fair market valuations of the Sculpture as independently determined by each of CPS (on behalf of Maya and Olivier) and Pelham.  Not surprisingly, Maya and Olivier initially were extraordinarily pleased with the result and immediately inquired as to whether Pelham would be interested in acquiring additional works by

her father.  Olivier likewise was pleased, and entered into another agreement with CPS to arrange additional sales.  Then Maya's daughter learned of the sale.

3.      For good reason, Maya had directed Olivier and CPS not to apprise her daughter Diana Widmaier-Picasso ("Diana") of the contemplated sale of the Sculpture:  Maya sought to avoid the anticipated entreaties that the Sculpture be sold through Diana to her long-term ally Larry Gagosian, without a care or concern for the Sculpture's intrinsic artistic value. Rather, Maya was adamant that the Sculpture was to be sold to a museum, with stipulations against its reproduction that could commoditize the artwork and risk its further damage during the casting process.  Pelham complied with Maya's wishes and expressly agreed to the restriction on reproduction of the Sculpture in the contract (the "Pelham Sale Agreement").

4.      As a petulant child is wont to do, however, when Diana learned of the sale to Pelham, she flew into a rage, demanded that the Pelham Sale Agreement be repudiated, and that a new sale be made to Gagosian and his gallery (together "Gagosian").  As indulgent mothers are wont to do, Maya acceded to her daughter's demands.  At Diana's direction, Maya repudiated the Pelham Sale Agreement on the eve of the last of three installment payments, and then entered into a secret second sale of the Sculpture to the Gagosian Gallery, which immediately resold the Sculpture to the highly sophisticated art collector Leon Black ("Black"). Although Maya's actions may be understandable from a familial perspective, they are in utter disregard of the valid and enforceable contractual rights of the counterparty to the sale agreement she entered into months earlier.

5.      Diana's conduct was entirely unjustified.  She directly interfered with the contract that she knew her brother and mother had effectuated with Pelham, both out of evident animosity over being excluded from the initial sale and in order to further her long-term

2

relationship with Gagosian.  Moreover, by acting as Gagosian's agent in connection with the second sale, Diana secured an extremely lucrative commission from the art merchant.  Diana's conduct constitutes tortious interference with Pelham's contract.

6.      As the principal pulling the strings, Gagosian is equally and indeed primarily liable for tortious interference with the Pelham Sale Agreement.  In a failed attempt to deflect that liability, Gagosian asserted in prior submissions to this Court that it blindly entered into the second sale with no knowledge of Pelham's interest.  That position is legally and factually deficient.  It fails first because Diana's undisputed knowledge of the Pelham Sale Agreement is attributed to Gagosian under black letter agency law.  It also is an insufficient defense in view of the art merchant's due diligence obligations, which at a bare minimum required a reasonable and good faith inquiry into the status of the ownership of the Sculpture before it was acquired.  Further, Gagosian's purported ignorance is incredible.  Diana notified Gagosian promptly upon learning of the Pelham sale, and Gagosian immediately began to arrange the surreptitious second purchase of the Sculpture from Maya and simultaneous resale Black.

7.      The Picassos and Gagosian "washed" the sale to Black through the Gagosian Gallery in a failed attempt to transfer title to Black before he learned of Pelham's priority claim, fully appreciating that such knowledge would bar Black from taking clean title and require the transaction to be unwound.  Gagosian thus rushed to close the back-to-back purchase and resale of the Sculpture by paying a grossly-inflated price of $105 million, just days after Pelham advised Maya it would pursue a suit—and the very day before it commenced suit— to enforce its contract.  Gagosian's claim that, head-in-the sand, it was unaware of Pelham's interest is belied by the urgency and magnitude of the second sale; and for all the reasons stated,

3

is insufficient to insulate it from tort liability—or allow it to take clean title as a *bona fide* purchaser for value.

8.     The credibility of Gagosian's position is further belied by the extraordinary and coordinated efforts that Gagosian, Diana and Maya undertook to conceal Gagosian's role and the subsequent sales until they could assert that title had transferred to Black (which in the end failed).  As an initial matter, the Picassos and Gagosian imposed strict confidentiality on everyone involved in the subsequent sales to Gagosian and Black.  Thereafter, Maya Picasso and her counsel actively concealed the existence of these sales and, instead, advanced untenable positions to delay Pelham's relief in the related proceedings Pelham commenced to preserve and enforce its priority contractual rights.

9.     Pelham brought a proceeding against Maya and CPS for specific performance of the Pelham Sale Agreement on May 13, 2015, fully nine months before this action was commenced.  The action was filed in Switzerland pursuant to the contract's exclusive forum selection clause.  On the same day Pelham obtained and served a Writ of Seizure in France, enjoining Maya from moving or transferring the Sculpture.  Maya did ***not*** respond to those actions by stating that a valid sale had been made to Gagosian or Black, which would have been the natural rejoinder had a legitimate $105 million sale occurred.  Maya's counsel instead asserted that Maya had suffered from a ***temporary*** mental incapacity that rendered the Pelham agreement invalid, and concealed the subsequent sales to Gagosian and Black.

10.     This "incapacity" argument was a smokescreen.  First, Maya's counsel was never able to persuasively substantiate the claim.  Second, the claim conveniently ignored the fact that Maya did not do the deal with Pelham on her own.  As noted, she was assisted and protected by her son, who is a lawyer, and CPS, who assured that the Pelham Sale Agreement

4

was fair and served her avowed interests.  Finally, it strains credulity to assert that Maya was incompetent when she and Olivier made the agreement with CPS and Pelham, yet competent shortly thereafter when she and Diana sold the Sculpture to Gagosian and engaged in litigation with Pelham.  Recognizing the facial implausibility of Maya's position, in a decision issued February 24, 2016, the French *court refused to accept Maya's argument that she lacked the requisite capacity* to authorize the Pelham Agreement, finding that there was no evidence to support her claim and substantial evidence to the contrary.  The court's decision clears the way for Pelham to seek a ruling that Maya's transfer constituted criminal contempt.

11.     Through Maya and Diana's concerted effort in the pending foreign proceedings, Gagosian's name did not surface until almost a year after the Pelham Sale Agreement was executed, when Pelham's counsel discovered by happenstance that the Sculpture was on display at the Museum of Modern Art in New York City, "[c]ourtesy [of] Gagosian Gallery."  Diana and Gagosian deliberately selected that equivocal characterization of Gagosian's interest to continue to conceal their contrived sale.  In other words, the Sculpture was secreted out of France with no notice to Pelham or the foreign tribunals, despite the pending proceedings in Switzerland and the Writ of Seizure in France.  That extraordinary bad faith conduct undermines the credibility of the Picassos' and Gagosian's positions in this matter. Moreover, further evidencing their bad faith, Maya's counsel in Europe and Gagosian's counsel here in New York steadfastly refused to provide Pelham with any information in response to its repeated requests for clarification regarding Gagosian's interest in the Sculpture, and how it came to be in New York.

12.     Consequently, Pelham sought and obtained from this Court an order pursuant to 28 U.S.C. § 1782 for discovery in aid of the foreign proceedings (the "1782

Proceeding"). Specifically, on December 21 and 23, 2015, the Honorable Gregory Woods ordered Diana and Gagosian to produce on a rolling basis discovery relating to, *inter alia*, when they learned of the Pelham sale, their role in the repudiation of that sale, and the effectuation of the subsequent sales of the Sculpture. The disclosures that Diana and Gagosian have begrudgingly made to date in the 1782 Proceeding and foreign actions affirm the impropriety of their conduct. It is now irrefutable that Diana and Gagosian intentionally interfered with Pelham's priority contractual rights, with Diana acting as Gagosian's well-paid agent with full knowledge of Pelham's purchase.

13.     The very contracts Gagosian effectuated with Maya and Black demonstrate the disingenuous nature of their purported claims to the Sculpture. Gagosian's purported acquisition of the Sculpture from Maya was memorialized by a simple one-page invoice that, remarkably, purports to have been executed on May 12, 2015, the day before Pelham commenced legal proceedings in Switzerland and the Writ of Seizure was issued in France. Tellingly, the invoice lacks a standard seller warranty from Maya as to her ability to provide clean title. The invoice also unusually calls for the transfer of title to Gagosian before full payment was to be made. And again quite remarkably, the invoice called for the title transfer on October 2, 2015, before payment in full and shortly before Pelham served Gagosian with formal notice of its priority claim on October 19, 2015. The highly coincidental timing of the purported execution and transfer of title raises serious questions as to its authenticity. Even if that invoice is not a back-dated fabrication, there is no avoiding the fact that Diana and therefore her principal, Gagosian, ***knew*** of the Pelham Sale Agreement and intentionally interfered with that contract to effectuate a second sale to Gagosian and a subsequent resale to Black.

14.     The Gagosian agreement with Black likewise is atypical. Gagosian's contract with Black also unusually called for the transfer of title and possession to Black at the close of the MoMA exhibition on February 7, 2016, **before** payment in full is made.  As noted, the evident plan was to convey title and possession to Black before he obtained actual notice of Pelham's priority interest in an effort to fabricate a claim that Black is a *bona fide* purchaser for value who takes clean title regardless of Gagosian's malfeasance.  That plan failed, as Black received actual notice of Pelham's claims and has yet to take title or possession.  Even without that actual knowledge, any claim by Black to the Sculpture fails as he is a highly sophisticated art collector who utilized the expertise of some of the best art professionals in the world in connection with the transactions at issue.  As with Gagosian, the onus was on Black to conduct reasonable due diligence concerning the transaction, especially in light of multiple red flags associated with the purported sale of the Sculpture.  Any *de minimis* due diligence would have revealed Pelham's priority claim.  Gagosian and Black cannot claim, therefore, that either is entitled to take the Sculpture free and clear of Pelham's interest.

15.     For the foregoing reasons, Pelham brings these third party claims, first, for a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), that Gagosian and Black are not owners and have no title or interest in the Sculpture, and therefore must relinquish the Sculpture.  Second, Pelham respectfully requests an order that Diana and Gagosian tortiously interfered with the Pelham Sale Agreement, entitling Pelham to general, consequential and punitive damages, as well as its attorneys' fees and expenses.  Third, Pelham respectfully contends it is entitled to actual and punitive damages from Gagosian for conversion of the Sculpture.  Fourth, and finally, Pelham respectfully submits it is entitled to an order on its replevin claim, requiring Gagosian to convey the Sculpture to Pelham.

8760828v.1

## THE PARTIES

16.       Third Party Plaintiff and Counterclaim-Plaintiff Pelham is an art advisory firm based in London, United Kingdom.  Pelham's principal place of business is 5 Hanover Square, London NW1S HE, United Kingdom.  At all times relevant to this dispute, Pelham has purchased art for sale to Sheikh Jassim bin Abdul Aziz Al-Thani and the Qatar Museums Authority.  Guy Bennett, the principal of Pelham, is currently the Chief of Collections and Acquisitions of the Museums Authority of Qatar.

17.       Counterclaim-Defendant Gagosian Gallery, Inc. ("Gagosian Gallery") is a chain of art galleries.  It is a corporation organized under the laws of the State of New York, with its principal place of business at 980 Madison Avenue, New York, NY 10075.

18.       Third Party Defendant Lawrence ("Larry") Gagosian is the owner of Gagosian Gallery, Inc.  He is an art dealer and merchant who owns a number of galleries, several of which are in the Southern District of New York.  Larry Gagosian resides in and is domiciled in New York, New York.

19.       Third Party Defendant Diana Widmaier-Picasso is the granddaughter of Pablo Picasso and the daughter of Maya.  She resides in and is domiciled in New York, New York.  In connection with the events material to this action, Diana acted on her own behalf and in the capacity of agent for Gagosian.

20.       Third Party Defendant Leon Black is highly sophisticated and world-renowned art collector.  As an experienced buyer and seller of art and a museum trustee, Black has access to and avails himself of the services of some of the most sophisticated art professionals in the world.  Black resides in and is domiciled in New York, New York.

8760828v.1

## JURISDICTION AND VENUE

21.     The Court has diversity subject matter jurisdiction and supplemental subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1332 and 1367. Pelham is a citizen of the United Kingdom and all of the other parties are citizens of New York.

22.     The Court has personal jurisdiction over Larry Gagosian because he is a resident of New York, and because he participated in a sale of the Sculpture in New York that, among other occurrences, gave rise to this action.  He has also consented to the jurisdiction of the Southern District of New York in another action related to this matter, Pelham's 1782 Application.

23.     The Court has personal jurisdiction over Diana because she is a resident of New York, and because she participated in a sale of the Sculpture in New York that, among other occurrences, gave rise to this action.  She has also consented to the jurisdiction of the Southern District of New York in another action related to this matter, Pelham's 1782 Application.

24.     The Court has personal jurisdiction over Black because he resides in this jurisdiction, and because he participated in the sale of the Sculpture in New York that, among other occurrences, gave rise to this action.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the sales of the Sculpture to Gagosian and Black, facilitated by Diana, occurred in this District.  The Sculpture currently remains in this district.

26.     Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Counterclaim and Third Party Defendants all reside here and are subject to this Court's personal jurisdiction.

27.     Joinder of Diana, Larry Gagosian, and Black is proper pursuant to Fed. R. Civ. P. 19(a)(1)(A) and (B) as they are required parties without which the Court cannot provide complete relief.  Diana and Gagosian are liable for damages to Pelham arising from their tortious interference with the Pelham Sale Agreement.  Additionally, Gagosian and Black are required parties because they claim an interest relating to the Sculpture that is the subject of the action and because their absence would impede Pelham's ability to protect its interests.

## FACTS

28.     This action implicates three sales of the same Sculpture, only the first of which is valid and enforceable.

### A.     *The First Sale of the Sculpture to Pelham*

29.     At the end of 2012, Maya met with a representative of the art advisory firm CPS, and proposed that they sell three of her father's sculptures to Pelham, to be put on display by the Qatar Museums Authority.  Among these works was the Sculpture.

30.     Maya advised CPS at the time that she did not want her daughter Diana to know about the transaction or to be involved in the sale in any way.  Maya was concerned that Diana would make reproductions of the Sculpture through casting, to which she was firmly opposed.  Casting could potentially damage the Sculpture physically and in terms of its unique artistic value.  Maya thus wanted a firm commitment from the buyer to protect the Sculpture from being casted in the future.  Maya also was concerned that Diana would sell the Sculpture to Gagosian.  Maya did not want to sell the Sculpture to a dealer because she did not want to lose

control over the Sculpture's future ownership.  During these discussions, Maya did not demonstrate any lack of capacity or mental impairment whatsoever, but rather was clear in her intent.

31.     CPS advised Pelham of the works that Maya had made available for sale to Pelham.  Pelham expressed interest in the Sculpture, and also in one other work not at issue in this litigation.  CPS communicated Pelham's interest in the works to Maya.  However, no sale took place at the time.

32.      In June of 2014, Maya's son Olivier (through his company "Welcome") entered into an agreement with CPS to provide consulting services to CPS consisting of the identification of Pablo Picasso's works potentially available for sale through CPS.  Olivier demanded, and CPS agreed to pay, Olivier a lucrative fee for his services.

33.     Maya then directed CPS to revive the negotiations with Pelham regarding a sale of the Sculpture with CPS.  During her discussions with CPS, Maya again did not demonstrate any lack of capacity or mental impairment whatsoever, but clearly articulated the same intent expressed during her prior discussions with CPS.  Once again Maya directed CPS not to disclose the potential sale to Diana.  Maya repeated that she did not want Diana to involve Gagosian in a potential sale.  She said she would personally inform Diana of the sale when she felt it was appropriate.  Maya reiterated that the Sculpture was to be sold for display in a museum without reproduction rights.

34.     With that clear and reasonable directive, on October 10, 2014, Maya executed a Mandate of Sale which granted CPS "irrevocable" authority to sell the Sculpture on her behalf.  Maya expressly guaranteed therein that she is "now and in the future validly entitled

to transfer the possession and ownership" of the Sculpture.  Maya authorized CPS to offer the Sculpture only to Pelham.

35.     CPS then set an asking price for the Sculpture.  In the 2012 period, CPS had estimated that the Sculpture was likely worth between approximately €28 million and €30 [approximately $36.4 million and $38.9 million].  In 2014, after careful consideration and analysis, CPS arrived at a similar, but higher offering price for the Sculpture.  CPS based the offering price for the Sculpture on its understanding of the market at the time and the circumstances of the sale, including the specific provisions that Maya required in the Mandate of Sale.  In setting the offering price, CPS considered, among other things, that (1) the publicly available world record price paid for a Picasso sculpture (*Tête de Femme* (*Dora Maar*)) at the time was approximately $29 million, including a buyer's premium; (2) the world record price for a Picasso plaster (*Le Taureau*) was approximately $3 million; (3) the closest comparable plaster sculpture sale was the sale of Constantin Brancusi's *Une Muse* for approximately $12.4 million; (4) the *Une Muse* price constituted the record price ever paid in a public sale for any plaster sculpture by any artist; and (5) another version of the Sculpture had been insured for between $45 to $50 million when displayed at the "Picasso Black and White" exhibition at the Solomon R. Guggenheim Museum in 2012.

36.     With no prior knowledge of CPS's valuation, Pelham independently derived a value for the Sculpture, using a similar standard methodology.  In setting the price for the Sculpture Pelham considered the fact that the highest price ever paid for a Picasso sculpture at the time was approximately $29 million and that the record price for Amedeo Modigliani's stone sculpture of a woman's head at the time was €43.18 million [approximately $52.8 million]. Pelham considered Modigliani's *Head* to be a comparable sculpture because Modigliani was an

12

artist of the same generation as Picasso and was one of just three artists in his generation to achieve distinction in three different media, including sculpture.

37.     CPS engaged in arms-length negotiations with Pelham with respect to the sale of the Sculpture.  During the course of the negotiations, Pelham increased its offer for the Sculpture several times.

38.     Pelham never communicated directly with Maya during the course of the negotiations.

39.     Through CPS, Maya and Olivier were directly involved in the sale process.  Both were kept fully informed of the negotiations.

40.     CPS sold the Sculpture to Pelham on November 13, 2014, pursuant to a Sale Agreement.  The Pelham Sale Agreement provided for the sale of the Sculpture to Pelham in exchange for payment of €38,000,000, which, at the time of the sale was the equivalent of approximately $47,000,000.  Pelham in turn agreed with Sheikh Jassim bin Abdul Aziz Al-Thani to convey the Sculpture to him for exhibit by the Qatar Museums Authority at the same price at which Pelham purchased the Sculpture from Maya.

41.     Maya was pleased with her decision to sell the Sculpture to Pelham.  In fact, she was open to further dealings with Pelham and offered for sale additional works by Pablo Picasso.  In particular, Maya offered Pelham a Pablo Picasso oil painting of Maya as a child titled *Maya à la poupée et au cheval de bois* (*Maya with doll and wooden horse*).

42.     Olivier likewise was pleased with the outcome of the negotiated sale of the Sculpture to Pelham.  Immediately after the execution of the Pelham Sale Agreement, Olivier invoiced and received from CPS his "consulting fee."  Additionally, in early January 2015,

Olivier proposed to renew the consulting agreement with CPS, insisting on even greater fees for introducing other Picasso works for sale through CPS. CPS agreed to Olivier's terms.

43.     The Pelham Sale Agreement provided that the purchase price would be paid in three installments. The first installment payment of €1,900,000.00 was due before December 1, 2014; the second payment of €4,000,000.00 was due before January 15, 2015; and the final installment payment of €32,000,000.00 was due on or before April 20, 2015. Pelham performed in accordance with the Sale Agreement and submitted the first two payments required by the agreement. These payments were received and accepted without reservation by CPS, who transferred the payments to Maya and Olivier.

44.     On April 10, 2014, just days before the final payment was due, counsel for Maya repudiated the Pelham Sale Agreement. Pelham rejected that repudiation and proffered the final payment, which was not accepted.

**B.     *Larry Gagosian and Diana Widmaier-Picasso Tortiously Interfere with Pelham's Sale Agreement***

45.     Diana and her long-term acquaintance Larry Gagosian were the architects of Maya's repudiation of the Pelham Sale Agreement.

46.     Diana has had a longstanding and close relationship with Larry Gagosian. They frequently attend each other's events and support each other's endeavors. For example, Larry Gagosian provided initial funding for a catalogue raisonné of Picasso sculptures being authored by Diana. He also financed Diana's filmed interviews for "Picasso.mania." In return, Diana facilitated exhibitions of Pablo Picasso's works at the Gagosian Gallery, and the sale of the works by the gallery. Diana earned commissions on such sales.

47.     Well before Maya executed the Pelham Sale Agreement, Diana had acted and advocated on Larry Gagosian's behalf in an attempt to persuade Maya to sell Picasso

artwork to Gagosian.  Her interests were not altruistic.  She sought to secure from Gagosian a commission on the sale of the artwork to Gagosian.  That was exactly the reward she pursued after discovering the sale of the Sculpture to Pelham.

48.     On March 11, 2015, months after Maya, Olivier and CPS negotiated and effectuated the Pelham Sale Agreement, but before the final payment under the agreement was due, Diana learned of the transaction.  Diana was enraged that Maya sold the Sculpture to Pelham without Diana's consultation.  Diana immediately advised Gagosian of the Pelham sale, and the two colluded to interfere with the Pelham Sale Agreement.

49.     Within just two days of her discovery of the sale, Diana demanded that her mother repudiate the Pelham Sale Agreement.  Moreover, Diana dictated to Maya the argument to make as a basis for a purported repudiation.  Without first having engaged in any medical evaluation of Maya's mental capacity to sell the Sculpture to Pelham, Diana said she would direct Maya's counsel to argue that Pelham took advantage of Maya's mental weakness and that Maya's consent was not valid.  Diana further stated that she would move forward with Gagosian to arrange a sale to another buyer, and she proceeded to do so.

50.     Diana and Gagosian devised a scheme whereby Maya would sell the Sculpture to Gagosian, without making any representation regarding competing title claims, and then Gagosian would sell to a new purchaser and warrant that it had the authority to convey unencumbered title to the Sculpture.  The dual-contractual relationship insulated Maya from conversations with the new buyer to avoid Maya from having to respond to inquiries as to whether she had previously committed the sale of the Sculpture to any other entity, such as Pelham.  Gagosian then rushed to secure an offer before Pelham made its final payment under the Pelham Sale Agreement.

51.     Gagosian quickly identified a buyer for the Sculpture by reaching out to Black, who had set a record for the highest price paid for a work of art sold at auction in 2012 with his $120 million purchase of Edvard Munch's famous painting *The Scream*.  As that acquisition indicates, Black was a well-known and highly sophisticated art collector, highly experienced in the purchase and sale of art, with a track record for purchasing art work at premium prices.  Black employs a staff of people who take care of his expansive art collection. Black has access to and avails himself of the services of some of the best art professionals in the world—advisors, lawyers, and curators, among them.  This sale was no exception.  Black utilized a number of art professionals, including an art attorney and a curator who, among other things, conducted a physical inspection of the Sculpture.

52.     On April 9, 2015, after a series of discussions, Gagosian met for dinner with Black and came close to a deal, subject to the negotiation of the contractual terms and inspection of the Sculpture.  With that in hand, Diana directed Maya's counsel to send a letter to CPS the next day disavowing its authority to sell the Sculpture on Maya's behalf.

### C.    *Maya's Counsel Directs CPS to Cancel its Mandate Due to Maya's Purported Temporary "Incapacity"—Without Disclosing the Second Sale*

53.     On April 10, 2015, Maya's counsel sent a letter to CPS requesting that CPS cancel the sale of the Sculpture to Pelham.  CPS forwarded the letter to Pelham.  In this letter, Maya's counsel contended for the first time that Maya lacked the mental capacity to enter into the Mandate of Sale with CPS.  Significantly, two days later, Maya's counsel clarified for CPS that, notwithstanding her request, "***Guy Bennett [of Pelham] and the buyers for whom he is acting were not at fault in this deal***."

54.     CPS was surprised by the contention that Maya lacked the mental capacity to enter into the Mandate of Sale with CPS, which was inconsistent with CPS's observations

during its discussions with Maya and Olivier regarding the Sculpture across several years. Indeed, CPS would not have entered into the Mandate of Sale or the Pelham Sale Agreement had it had any indication that Maya's capacity to sell the Sculpture was in the least impaired.

55.     Notably, Maya's counsel did not contend that **Olivier**, a lawyer by education, who provided significant assistance with the sale, suffered from any mental defect that would have inhibited his ability to protect Maya's interests during his substantial involvement in the negotiation of the Mandate of Sale with CPS and the Pelham Sale Agreement. In fact, Maya's counsel's correspondence falsely asserted that the sale had taken place without the knowledge of Maya's three children, when Olivier was intrinsically engaged in the sale process.

56.     Maya's counsel was not able to provide reliable evidence sufficient to establish Maya's incapacity at the time of sale of the Sculpture.  The counsel produced medical reports that were wholly inconclusive and unpersuasive. Throughout April and May 2015, while Pelham, through counsel, was engaged in good faith negotiations to prevent Maya from repudiating her contractual agreement to sell the Sculpture, Maya's counsel engaged in persistent dilatory tactics by pushing out the date of Pelham's final payment thus allowing the sales to Gagosian and Black to take place in the meantime.

57.     Finally, on May 5, 2015, Pelham's counsel wrote to Maya's counsel, noting her failure to provide reliable evidence of Maya's purported lack of capacity and stating that Pelham intended to proceed with the sale of the Sculpture.

58.     Nonetheless, Maya's counsel asked CPS to cancel the Pelham Sale Agreement.  **CPS correctly responded by stating that it had no authority to do so.**

59.     After being pressured by Maya's counsel, CPS cancelled its exclusive Mandate of Sale on May 11, 2015.  That cancellation, however, had no legal import with respect to Pelham's priority rights under the Pelham Sale Agreement.  The Pelham Sale Agreement was validly executed with CPS -- which at the time had the actual and apparent authority to act for Maya -- and Pelham proffered full performance of the agreement.

60.     All the while that Maya's counsel was corresponding with CPS and Pelham regarding Maya's repudiation of the Pelham Sale Agreement, Diana and Gagosian worked to effectuate the contemplated sale by Maya to Gagosian and resale to Black.  While Maya was allegedly incompetent to sell the Sculpture to Pelham with *Olivier's* assistance, she apparently was competent enough to sell the Sculpture to Gagosian with *Diana's* assistance.

### D.     *Gagosian and Diana Effectuate the Secret Sale to Gagosian and Resale to Black*

*61.*     Gagosian and Diana rushed to close the back-to-back purchase and resale of the Sculpture.  Gagosian finalized the terms of a sale agreement for the Sculpture to Black, which was completed by May 4, 2015.  On a parallel track, Diana arranged for an expert retained by Black to fly to Paris on May 7, 2015, and to be immediately shuttled from the airport to where the Sculpture was housed under Maya's control, so she could validate the condition of the Sculpture.

62.     Gagosian and Diana then finalized the purchase of the Sculpture from Maya pursuant to a letter invoice dated May 12, 2015 (the "Gagosian Invoice").  Unlike the Pelham Sale Agreement, the Gagosian Invoice does not contain any conditions prohibiting the reproduction of the Sculpture.  Rather, the deal is all about the money.

63.     Moreover, there are two aspects of the terms of sale that are so coincidental as to defy credulity.  First, the Gagosian Invoice purportedly was executed on May

12, 2015, the day before Pelham commenced the Swiss Litigation and obtained the Writ of Seizure from the French court.  It is incredible to contend that it was pure fortuity that Gagosian—without any awareness of the Pelham contract and threatened litigation—executed an invoice the day before Pelham brought the Swiss Litigation and obtained the Writ of Seizure. Second, the Gagosian Invoice called for passage of title on October 2, 2015, which remarkably, was shortly before Gagosian received formal notice from Pelham of its priority rights.  Again, the timing defies credulity.

64.     In addition, and quite telling, the Gagosian Invoice contained no representations or warranties regarding the ownership or authenticity of the Sculpture, which are extremely common in the art industry for a sale of a multimillion dollar work by one of the most famous twentieth century artists.  In contrast, both the Pelham Sale Agreement and the CPS Sale Agreement contain express warranties regarding the ownership of the sculpture and the seller's ability to transfer clean title to the artwork.  Because both Diana and Gagosian knew that there was an active dispute regarding the title to the Sculpture, and that Maya could not represent to the contrary, they purposefully omitted any terms concerning the Sculpture's title and ownership.

65.     The terms and effectuation of the agreement governing Gagosian's resale of the Sculpture to Black (the "Black Agreement") likewise furthered the scheme to thwart Pelham's rights.  The conveyance to Black was structured as a two-step transaction, rather than a sale directly from Maya to Black, in an attempt to afford Black with the ability to assert that he was a *bona fide* purchaser who took title to the Sculpture without any knowledge of Pelham's priority rights.  For Gagosian and Diana's scheme to work, it was essential that Pelham not learn of the second sale before they secreted the Sculpture out of France and conveyed title and possession to Black.  Thus, the Black Agreement mandated that the purported sale be maintained

in confidence, and Diana specifically directed Black's agent not to disclose the sale to the MoMA because "we want to keep it confidential for now."

66.     For the same reason, the Black Agreement imposed unusually strict time constraints upon Black to confirm the condition of the Sculpture. Black was given only a few days to fly his curator to Paris to inspect the work and have her prepare a report on its condition, and then to accept or reject the Sculpture. Black's failure to comply with this tight time limit would have resulted in a default, whereby Gagosian could terminate the agreement, which gave Black's team concern whether he would lose the work for logistical reasons. This stringent deadline was particularly unusual in view of the magnitude of the contemplated sale, and raised a red flag for a sophisticated buyer like Black as to propriety of the transaction, which Black should have addressed before continuing with the transaction.

67.     Moreover, like the Gagosian Invoice, the Black Agreement provided that title to the Sculpture would be conveyed before full payment was made. As noted above, the Gagosian Invoice provided that title would transfer to Gagosian in October 2015, before the final payment on April 16, 2016. The Black Agreement provided that title would pass when the Sculpture was released from the MoMA, on February 7, 2016, before final payment on April 15, 2016. The unusual early title transfers were designed to further the argument that they were made in good faith without knowledge of Pelham's priority interest. But in the end they only serve to underscore the bad faith nature of the transactions. As discussed further below, neither Gagosian nor Black is a *bona fide* purchaser for value because neither took title or possession before or without actual or constructive knowledge of Pelham's priority interest.

### E.      *Pelham Commences Litigation in Switzerland and France*

68.      The Pelham Sale Agreement required adjudication of disputes arising thereunder in the courts of Geneva, Switzerland.  Faced with the unjustified repudiation of that agreement, on May 13, 2015, Pelham instituted legal action against CPS and Maya in the Geneva Court of First Instance (*i.e.,* the equivalent of a U.S. District Court) seeking specific performance under the Sale Agreement ("Swiss Litigation").

69.      Also on May 13, 2015, Pelham petitioned for and obtained a Writ of Seizure from the High Court of Paris.  The Writ of Seizure was served on Maya, who spoke to her counsel while service of process was taking place.  The Writ of Seizure had the effect of rendering the Sculpture legally unavailable for any disposition, which meant that Maya was prohibited from "alienat[ing] [the Sculpture]" or "mov[ing] it . . . under penalty of sanctions provided in Article 314-6 of the [French] Criminal Code."  The Sculpture was in Paris under Maya's control when the Writ was served.  Maya thus was obligated to maintain the Sculpture in France pending the resolution of the Swiss Litigation.

70.      Pelham then proceeded with a good faith adjudication of the Swiss Litigation with the expectation that Maya would do so as well, particularly insofar as Maya did not raise any objection to the validity of the Writ of Seizure with the court at that time.  Hoping to reach a reasoned resolution, Pelham's counsel arranged to meet with Maya's counsel for a court-ordered conciliation hearing at the end of August 2015.

71.      Unbeknownst to and without notice to Pelham, however, Diana had persuaded Maya to effectuate the second sale of the same Sculpture to Gagosian and to secrete the Sculpture out of France in violation of the Writ of Seizure.  The Widmaier-Picasso family

and Gagosian actively concealed this malfeasance from Pelham, which only discovered the truth through piecemeal disclosures over time.

### F.      Maya's Counsel Refuses to Provide Details of a Second Sale

72.      After the conciliation hearing, Pelham and CPS sought specification of Maya's position in the litigation.  By letter dated September 9, 2015, Maya's counsel responded to CPS's request by asserting that a **second** sale of the Sculpture "took place in May 2015" pursuant to a "firm" offer that purportedly was made before October 10, 2014.  That position was remarkable in two regards.  First, Maya and her counsel had made no mention of a second sale in May 2015, when the Swiss Litigation was commenced and the French Writ of Seizure was obtained.  Second, the assertion that a "firm" offer had been made for the Sculpture before October 2014 was contrary to the representations Olivier and Maya made to CPS, and contrary to the representations all three made to Pelham.  Further, no evidence of this purported "firm" offer—let alone any acceptance of that offer—has ever been produced, and Gagosian has not made any reference to a firm offer in subsequent proceedings.  It apparently was a pure fabrication designed to pressure Pelham to accept Maya's repudiation of the Pelham Sale Agreement.

73.      Pelham and CPS understandably made repeated requests for further details on the second sale and prior firm offer, but Maya's counsel refused to make any disclosures, concealing whatever additional information existed.  Pelham therefore determined it had to proceed with formal disclosure demands.  Before it did so, a second remarkable revelation occurred that required Pelham to seek those disclosures in the United States.

### G.      The Sculpture is Secreted from France

74.      On September 14, 2015, the Museum of Modern Art in New York City ("MoMA") opened an exhibition entitled "Picasso Sculpture."  The Sculpture was displayed in

22

the "Boisgeloup Sculpture Studio" part of the exhibition.  Despite the pending foreign

proceedings, and the Writ of Seizure prohibiting the transfer of the Sculpture, neither Maya nor

her counsel advised Pelham that the Sculpture had been removed from France, provided to

Gagosian, and put on display.  Rather, Pelham learned of the exhibition from public disclosures.

74.    75.    The MoMA exhibition materials listed the Sculpture as provided

"[c]ourtesy [of] Gagosian Gallery."  Diana and Gagosian had selected that designation to conceal

Gagosian's purported purchase of the Sculpture.  As a consequence, Pelham was not

immediately aware that Gagosian had purported to acquire the Sculpture.

76.    Pelham therefore provided Gagosian with a formal written notice of its

priority claim to the Sculpture and the pending Swiss Litigation and French proceedings by letter

dated October 19, 2015.  Pelham's counsel also asked Gagosian's counsel to explain how

Gagosian obtained possession of the Sculpture to temporarily convey it for exhibit at the MoMA.

Gagosian refused to provide any information.

### H.    Pelham Discovers a Second Sale of the Sculpture to Gagosian

77.    To ascertain the details of the subsequent sale of the Sculpture, as well as

the particulars of when and how the Sculpture was transferred from France, on November 18,

2015, Pelham commenced a proceeding in this Court for discovery from Gagosian and Diana in

aid of the foreign proceedings, pursuant to 28 U.S.C. § 1782.  After full briefing and argument,

on December 21 and 23, 2015, the Honorable Gregory Woods rejected each of the myriad

challenges advanced by Gagosian and Diana, and ordered both to make production of the

disclosures Pelham sought "on a continuing basis" to be complete by February 29, 2016.

Pelham's 1782 Application, Dkt. 32 at 2.  Judge Woods also ordered both to appear thereafter for

deposition.  *Id.*

78.     Of significance here, during the briefing of the   discovery application, Gagosian and Diana for the first time conceded that Diana had effectuated a second sale of the Sculpture to Gagosian.  *See generally id.* at Dkt. 18 & Dkt. 21.  Diana and Gagosian carefully avoided specific disclosure of when and how Diana learned of the sale to Pelham, and thereafter made the alleged sale to Gagosian.  In the submissions, Gagosian implausibly asserted that he had no knowledge of Pelham's prior purchase, claiming his gallery blindly took title to the Sculpture in May 2015.  *Id.* at Dkt. 21 at 4, 13.

79.     Gagosian also for the first time asserted that it had acquired the Sculpture "for more than $100 million," and subsequently sold it to an undisclosed buyer "for the amount of the Buyer's offer.  Gagosian's remuneration consisted of the difference between [Gagosian Gallery's] purchase price and the later resale price."  *Id.* at Dkt. 21 at 3-4.  Diana and Gagosian also claimed to have received offers for the Sculpture in the same amount as early as 2011 and 2012.  *Id.* at Dkt. 18 at 3 and Dkt. 21 at 4.

## I.     *The French Court Upholds Writ of Seizure Over Maya's Incapacity Claim*

80.     In addition to pursuing disclosures from Gagosian and Diana through the 1782 Proceeding, on October 16, 2015, Pelham commenced a contempt proceeding against Maya in the High Court of Paris for violating the Writ of Seizure by allowing Diana and Gagosian to secret the Sculpture out of France.  Maya countered by commencing a new proceeding before the court that had issued the Writ of Seizure to declare it invalid.

81.     On November 26, 2015, the High Court of Paris held that it could not enter a contempt finding because a factual ambiguity existed as to whether Maya exercised control over the Sculpture at the time that the Writ of Seizure was served upon her.  The High Court directed Pelham to seek clarity regarding validity of the Writ from the court that had

issued it and where Maya's proceeding addressing that issue was pending.  Pelham thus sought

clarity regarding the viability of the Writ of Seizure in the proceeding Maya commenced.

82.     On February 24, 2016, the French court held the Writ of Seizure was

valid, and in doing so, rejected Maya's myriad defenses to its enforcement.  Among other things,

the court noted that Maya had ***not*** demonstrated that she lacked the mental capacity to authorize

the sale of the Sculpture to Pelham.  The court's ruling thus cleared the way for Pelham to renew

its claim against Maya for criminal contempt on appeal of the initial decision or in a new action.

### J.     *Gagosian's Complaint and Press Statement*

83.     On January 12, 2016, the Gagosian Gallery initiated the complaint in the

instant action seeking a ruling that it has clean title to the Sculpture.  For the reasons stated, that

claim fails on the facts and the law.

84.     When it filed its complaint, Gagosian went to the press with a number of

false and misleading statements.  Among other things, Gagosian issued a statement that Sheikh

Jassim bin Abdul Aziz Al-Thani is "a long-time friend of the Gallery."  In fact, as Pelham was

advised, Sheikh Al Thani is not a long-term friend of, and has never purchased nor does he

intend to purchase anything from Gagosian.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### DECLARATORY JUDGMENT (28 U.S.C. § 2201 *ET SEQ.*)
### (Against Larry Gagosian and Leon Black)

85.     Pelham realleges and incorporates by reference each and every allegation

contained in the foregoing paragraphs of this Amended Third Party Complaint as if fully set

forth herein in full.

86.     Pelham is entitled to the Sculpture pursuant to the Pelham Sale Agreement and Pelham's tender of full performance thereunder.  The Pelham Sale Agreement was executed prior to, and has priority over, any later sale of the Sculpture.  Neither Gagosian nor Black is a *bona fide* purchaser for value because neither took title or possession of the Sculpture without actual or constructive knowledge of Pelham's priority interests in the Sculpture arising from its purchase from Maya in November 2014.

87.     Gagosian had actual and constructive knowledge of Pelham's priority interests before it purportedly took title in October 2015 and possession on February 7, 2016, based upon Gagosian's communications with Diana from as early as March 2015.  Moreover, Diana was Gagosian's paid agent in connection with Gagosian's acquisition and resale of the Sculpture, earning a substantial payment from Gagosian for her services.  Consequently, Diana's admitted knowledge of Pelham's priority interest in the Sculpture is attributed to Gagosian.

88.     Black had actual and constructive knowledge of Pelham's priority interest in the Sculpture based upon, *inter alia*, Gagosian's and Pelham's communications with Black before February 7, 2016, the date on which Black was meant to take title under his agreement with Gagosian.  Black has yet to take title to or possession of the Sculpture.

89.     Gagosian and Black also are not *bona fide* purchasers because, as merchants, both had the duty to undertake, but failed to conduct, reasonable due diligence relating to the transactions, particularly in view of the many "red flags" regarding the suspect nature of the purported sale transactions.  Any reasoned diligence would have revealed Pelham's priority claim.

90.     There were myriad "red flags" that raised issues relating to the propriety of the sale to Gagosian and resale to Black.  These red flags include: (i) the very fact that the sale

to Black was structured as a two-step transaction, with a transfer to Gagosian and simultaneous resale to Black, even though Black was fully aware of the identity of the seller; (ii) the exceptional haste in which the sale and resale was required to be effectuated, particularly in view of the magnitude of the sale; (iii) the unusual terms of the Black Agreement requiring Black's expert to complete the analysis of the Sculpture's condition in a highly constrained time frame upon risk of default; (iv) the cursory nature of the Gagosian Invoice, and Maya's failure to provide any warranty therein as to clean title or her lack of knowledge as to any other claims to the Sculpture; (v) the highly atypical terms of both the Black Agreement and the Gagosian Invoice that provided for transfer of title before final payment for the Sculpture; (vi) the designation of the Sculpture as provided "[c]ourtesy [of] Gagosian Gallery," on behalf of a private collection, when in fact Gagosian purportedly had purchased the Sculpture; and (vii) the requirement that all aspects of the sale and resale be maintained in complete confidence.

91.     Gagosian and Black also could not take title to the Sculpture because Maya's actions had voided her ability to convey good title, having committed criminal contempt by transferring the Sculpture from France in furtherance of the sale to Gagosian and resale to Black.

92.     Pelham seeks a declaration from this Court that neither Gagosian nor Leon Black is the owner of, or has a priority claim over Pelham to, the Sculpture and, therefore, must relinquish possession of the Sculpture to Pelham.

8760828v.1

## SECOND CLAIM

## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Larry Gagosian and Diana Widmaier-Picasso)

93.     Pelham realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Amended Third Party Complaint as if fully set forth herein in full.

94.     Gagosian tortuously interfered with the Pelham Sale Agreement in violation of New York law.

95.     Diana, individually and as the paid agent for Gagosian, tortiously interfered with the Pelham Sale Agreement, in violation of New York law.

96.     Diana and Gagosian knew of the existence of the Pelham Sale Agreement between Maya (through CPS) and Pelham.

97.     Alternatively, Diana's knowledge of the existence of the Pelham Sale Agreement is imputed to Gagosian because Diana acted as Gagosian's agent.

98.     Diana and Gagosian intentionally and improperly procured an anticipatory repudiation and breach by Maya of the Pelham Sale Agreement.  The procurement of the breach was improper for various reasons, including the fact that it was done to further the relationship between Diana and Gagosian, to secure or justify payments from Gagosian to Diana, and to secure sales commissions for Gagosian and Diana in connection with the sale to third buyer.

99.     The tortious interference by Diana and Gagosian with the Pelham Sale Agreement has caused Pelham harm entitling it to general and consequential damages.

100.    Pelham further is entitled to an award of punitive damages in an amount equal to multiple times Pelham's actual damages, plus its attorneys' fees and expenses.

8760828v.1

## THIRD CLAIM

## REPLEVIN
## (Against Larry Gagosian)

101.     Pelham realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Amended Third Party Complaint as if fully set forth herein in full.

102.     Pelham has a superior right of possession to the Sculpture by virtue of a valid Sale Agreement for which Pelham tendered full performance and that entitles it to the delivery of the Sculpture.

103.     Gagosian is in possession of the Sculpture.

104.     Pelham has demanded that Gagosian transfer the Sculpture to Pelham and Gagosian has refused to do so.

105.     Gagosian has deprived Pelham of its rightful possessory right to the Sculpture.

106.     Pelham seeks the return of the Sculpture pursuant to common law of New York and CPLR Article 71, or if repossession is not possible, the replacement value of the Sculpture.

## FOURTH CLAIM

## CONVERSION
## (Against Larry Gagosian)

107.     Pelham realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs of this Amended Third Party Complaint as if fully set forth herein in full.

108.    Pelham has a superior right of possession to the Sculpture by virtue of a valid Sale Agreement for which Pelham tendered full performance and that entitles it to the delivery of the Sculpture.

109.    Gagosian willfully, intentionally, and fraudulently exercised wrongful dominion and control over the Sculpture and converted the Sculpture in interference with Pelham's rights.

110.    In direct contravention of Pelham's superior rights and title to the Sculpture, Gagosian willfully, intentionally, and fraudulently deprived Pelham of its right to possession of the Sculpture.

111.    As a result of Gagosian's wrongful conversion of the Sculpture, Pelham has been damaged and is entitled to an award of actual and punitive damages, plus its attorneys' fees and expenses.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Defendant Pelham prays for the following:

A.    A declaration that Gagosian and Leon Black are not the owners of, and do not have priority claims over Pelham to the title to, the Sculpture.

B.    An order directing the transfer to Pelham of title to and physical possession of the Sculpture.

C.    An award of general damages against Diana Widmaier-Picasso and Larry Gagosian.

D.    An award of consequential damages in an amount to be determined at trial.

E.    An award of punitive damages in the amount no less than multiple times the actual damages award.

30

F.      An award of Pelham's attorneys' fees, expenses, and costs.

G.      An award of pre-judgment and post-judgment interest.

H.      Any other relief the Court deems just.


Dated:       New York, New York
             March 11, 2016

                              PATTERSON BELKNAP WEBB & TYLER LLP


                              By: ____/s/ Erik Haas_____
                              Erik Haas (ehaas@pbwt.com)
                              Julia Stepanova (jstepanova@pbwt.com)
                              Patrick Gibson (pgibson@pbwt.com)
                              1133 Avenue of the Americas
                              New York, New York 10036-6710
                              Tel: (212) 336-2000
                              Fax: (212) 336-2222

                              *Attorneys for Pelham Europe Ltd.*